Frank J. KELLEY, Attorney General of the State of Michigan, Plaintiff,

Commodity Futures Trading Commission, Intervening Plaintiff,

v.

James A. CARR and Charles P. LeMieux, III d/b/a Lloyd, Carr & Co., a partnership, James A. Carr and Charles P. LeMieux, III d/b/a Lloyd Carr Financial Co., a partnership, James A. Carr, and Charles P. LeMieux, III, Defendants.

No. G77–550 C.A.

United States District Court, W. D. Michigan, S. D.

Dec. 5, 1977.

Frank J. Kelley, Atty. Gen. by Marc A. Goldman, Asst. Atty. Gen., Lansing, Mich., for plaintiff.

Robert A. W. Boraks, Washington, D. C., for intervening plaintiff.

Bushnell, Gage & Reizen, Detroit, Mich., Noel A. Gage, Detroit, Mich., of counsel, for defendants.

348

## OPINION

FOX, Chief Judge.

This case was initiated by the Attorney General of Michigan in the Circuit Court for Ingham County. It was alleged that defendants were in violation of various sections of both the Michigan Uniform Securities Act, M.C.L.A. §§ 451.501 et seq. (1977), and the Michigan Consumer Protection Act, M.C.L.A. §§ 445.901 et seq. (1977) by transacting business as unregistered commodities broker-dealers and agents, transacting business fraudulently, and offering and selling unregistered securities. Plaintiff subsequently amended his complaint to allege violations of the anti-fraud provisions of the federal Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. (1977). Defendant Lloyd, Carr & Co. petitioned this court for removal of the action from the state court. The Commodity Futures Trading Commission (C.F.T.C.) then moved to intervene as a party plaintiff.

On November 7, 1977, I issued a temporary restraining order basically enjoining defendants from engaging in any sort of fraudulent or deceitful business activities. I also granted the C.F.T.C.'s motion to intervene. The matter is now here on motions by plaintiffs for preliminary injunctive relief.

Lloyd, Carr & Co. and Lloyd Carr Financial Co. were both founded in mid-1976, and are now partnerships between James A. Carr and Charles P. LeMieux, III. Lloyd, Carr & Co. engages in the business of soliciting and selling so-called London commodity options[1] on futures contracts. Lloyd Carr Financial is a commodity trading advisor; that is, it "engages in the business of advising others either directly or through

publications or writings, as to the value of commodities or as to the advisability of trading in any commodity . . .."[2] On August 1, 1977, the C.F.T.C. issued an opinion in an administrative proceeding instituted against Lloyd, Carr in early 1977. The Commission ruled that Lloyd, Carr was engaged in the business of selling and offering to sell commodity futures options without proper registration under federal regulations. It revoked the existing registration of Lloyd Carr Financial as a commodity trading advisor, denied the application for registration of Lloyd, Carr & Co. as a futures commission merchant, and entered a cease and desist order barring further violations of the Commodity Exchange Act. Lloyd, Carr appealed that ruling to the Second Circuit Court of Appeals, which stayed enforcement pending its determination.

Lloyd, Carr has its principal place of business in Boston, and has offices in several cities across the country, including one in Detroit. Activities in the Detroit office led to the initiation of this action by the Attorney General of Michigan, although plaintiff C.F.T.C. alleges unlawful activities in all Lloyd, Carr operations.

A futures contract is an agreement to purchase or sell a fixed amount of a commodity[3] of a certain grade at a certain future date for a fixed price. Futures contracts may be settled by delivery of the goods, but in the vast majority of cases an offsetting transaction occurs in which the holder of a contract to sell liquidates his position by purchasing a contract to buy the same commodity or the holder of a contract to buy cancels his position by acquiring a contract to sell. An option on a futures

1. These are options on futures contracts for certain commodities that are traded on several exchanges whose transactions are cleared through the International Commodity Clearing House.

2. 7 U.S.C. § 2. The statutory definition excludes advisors such as banks, newspaper columnists, attorneys, accountants, teachers, and "such other persons not within the intent of this definition as the Commission may specify by rule, regulation, or order."

Lloyd Carr Financial and Lloyd, Carr & Co. are basically alter egos. Accordingly, references hereinafter will simply be to "Lloyd, Carr."

3. The Commodity Exchange Act names those commodities included within its purview. 7 U.S.C. § 2. It also extends regulatory authority to any goods and articles and all services, rights, and interests in which contracts for future delivery are traded now or will be traded in the future.

contract is a right to buy or sell the contract for a particular commodity at a specified price, known as the "strike price," within a specified period of time. The purchaser pays a premium for the option in addition to broker's fees at the time of purchase and, if the option is exercised, at the time of sale. Options may be supported by an underlying futures contract at the time of their creation. Increasingly, however, so-called "naked options" are being sold. This type of option is one created without backing by either futures contracts or actual ownership of the commodities involved, and may be written by anyone willing to risk that he will be able to cover his obligation should the option be exercised.

It is evident that options are attractive to sellers in that capital requirements are minimal, and to buyers because costs are usually somewhat lower than purchasing a futures contract outright since the premium and initial broker's fees should run less than the margin requirements of the underlying contract, and investors can limit their potential losses. Owing to the ease of market entry, however, fly-by-night organizations are often attracted.

The potential for abuse in the field of option trading created a great deal of pressure for legislation outlawing fraudulent dealings in commodity options. The Commodity Exchange Act, passed in 1936, banned option trading in all domestic commodities within its scope. International commodities, such as those traded on the London exchanges, were not covered, however. In 1974 Congress responded by passing the Commodity Futures Trading Commission Act, which created the C.F.T.C. as an independent regulatory body paralleling the Securities and Exchange Commission and broadened the coverage of the 1936 Act. The 1974 Act amended Section 6c(b) to provide that the C.F.T.C. should have broad authority to regulate, through its rule-making powers, commodity options transactions.[4] Pursuant thereto, the C.F.T.C. adopted Rule 32.9, which states that:

> "It shall be unlawful for any person directly or indirectly—
>
> (a) To cheat or defraud or attempt to cheat or defraud any other person;
>
> (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;
>
> (c) To deceive or attempt to deceive any other person by any means whatsoever;
>
> in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction." 17 CFR § 32.9.

Plaintiffs allege that this provision has been violated by defendants. I conclude that the affidavits, exhibits, and testimony produced by plaintiffs clearly show that "the defendants purposefully engaged in the sort of continuous, concerted fraudulent practices that lie at the core of the prohibitions contained in Rule 32.9." *Commodity Futures Trading Comm'n v. Crown Colony Commodity Options, Ltd.*, 434 F.Supp. 911, 914–15 (S.D.N.Y.1977).

## I. FINDINGS OF FACT.

It is charged by plaintiffs that Lloyd, Carr has engaged in a high-pressure "boiler room" sales campaign in its efforts to sell commodity options.[5] The supporting evi-

---

**4.** 7 U.S.C. § 6c(b) provides in relevant part as follows:

". . . No person shall offer to enter into, enter into, or confirm the execution of, any transaction subject to the provisions of subsection (a) of this section involving any commodity regulated under this Act, but not specifically set forth in Section 2(a) of this Act, prior to the enactment of the Commodity Futures Trading Commission Act of 1974, which is of the character of, or is commonly known to the trade as, an 'option,' 'privilege,' 'indemnity,' 'bid,' 'offer,' 'put,' 'call,' 'advance guaranty,' or 'decline guaranty,' contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe . . . ."

**5.** Boiler room activity has been described as consisting essentially of "offering to customers securities of certain issuers in large volume by

dence creates a picture of an operation that has no place in an industry where "it is essential . . . that the highest ethical standards prevail . . .." [6] Defendants have responded by asserting that no "boiler room" exists since Lloyd, Carr rents space in fashionable buildings and conducts its business in well-appointed offices. They have not denied that they offer options "in large volume by means of an intensive selling campaign through numerous salesmen by telephone" without regard to the suitability to the needs of the customer. See note 5, *supra.* All that really appears to have happened is that the boiler room has been moved to the executive suite.

The first step in Lloyd, Carr's marketing program is the recruitment of sales personnel. In order to attract salespersons, advertisements soliciting applicants are placed in the daily newspapers in the cities where Lloyd, Carr has, or intends to open, offices. These advertisements state that "almost all [of our sales people] came to us from other industries with neither experience in nor knowledge of commodities as investment vehicle . . ... Income in the upper half of this group, . . ., ranges from $24,000 to $138,000 on an annual basis." The ads also indicate that salespersons receive intensive training. It is clear that Lloyd, Carr sales personnel have no background in the commodity options industry; the ads themselves provide sufficient support for that proposition. It is equally evident from the record before me, however, that despite its representation to the contrary, Lloyd, Carr fails to give salespersons adequate training concerning London commodity options before permitting them to solicit funds from prospective investors for option purchases and to advise investors as to the suitability of such investments.

The "intensive training" that Lloyd, Carr provides does not fully educate the newly-hired individual in the intricacies of the commodity industry. Rather, the training received is primarily in telephone sales techniques. The emphasis is on pressuring potential investors into purchasing. Scripts of "canned" sales pitches are often distributed to sales personnel and they are instructed to maintain control of the conversation at all times.[7]

---

means of an intensive selling campaign through numerous salesmen by telephone or direct mail, without regard to the suitability to the needs of the customer, in such a manner as to induce a hasty decision to buy the security being offered without disclosure of the material facts about the [security]." *SEC v. R. J. Allen & Assocs., Inc.,* 386 F.Supp. 866, 874 (S.D.Fla. 1974).

6. *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186–87, 84 S.Ct. 275, 11 L. Ed.2d 237 (1963), *quoting Silver v. New York Stock Exchange,* 373 U.S. 341, 366, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

7. One script runs as follows:

"Hello, this is ____ calling from Lloyd, Carr & Co. How are you today? The reason for my call is that I'm an investment broker with Lloyd, Carr & Co. . . .. We're one of the larger options investment firms in the country, and I've been speaking with investors throughout the . . . area recently, businessmen like yourself, about a very unusual opportunity for profit in the Sugar Market.
Have you been following sugar prices lately? . . . Fine. Let me tell you a little bit about what's happening, as what we're look-

ing at today is a rather unique situation in sugar.
"Sugar is presently selling for about 9–10¢ a lb. on the world exchanges in N. Y. and London. That's rather significant when you realize it costs the sugar producer 15¢ a lb. to produce sugar. Now, as a businessman, I know you can appreciate, when he's only getting back 9 to 10¢, something's got to change, Right? ____
Well, what's being done to change it is rather drastic. All the major sugar producers, 72 nations, are getting together, and forming a sugar cartel. You remember OPEC, the oil producers? ____ you remember how they got together a few years back and set a world wide floor price, you know a minimum price for oil? ____, would you believe it, the sugar producers are doing the same thing. They're getting together next month, forming a cartel, and setting a floor price for sugar, expected to be 15 to 16 cents a lb. Now because of this, and many other factors, the most conservative projections are, that sugar prices will reach the upper twenties per lb. by this time next year.
What does this mean to you as an investor Mr. ____?
(Don't wait for answer)
Well, sugar is the largest contract traded on the world market, 110,000 lbs. per contract,

This type of sales technique is known as a "cold calling" or "cold canvassing" approach. Salespersons make their calls to potential investors with whom neither they nor the company has had prior contacts. Names are collected from lists purchased from commercial customer list firms. After the initial, or "set-up" call, sales personnel begin a series of follow-up calls to pressure their potential client into buying an option. The evidence indicates that some people received daily calls for a month or more. The total number of calls made by Lloyd, Carr's salespersons is staggering. In the Detroit office alone over 50,000 long distance calls have been made in a 30-day period. Intense pressure is imposed on salespersons by supervisors who constantly monitor the sales force and often interject pep talks, exhorting the callers to make more sales. The managers of some branches have resorted to bizarre actions to stimulate sales; one often wears a gorilla suit and mask while roaming the sales floor, while another masquerades in a Superman costume. When a sale is made, bells are often rung throughout the office, and personnel stand to cheer. In effect, a circus atmosphere is created. Prizes are often awarded to provide incentives for higher sales. For each sale made by a salesperson, he receives a commission of ten percent. A quota system is employed whereby quota sheets requiring that certain targets be met are distributed each day. If the quota for the number of daily phone calls or monthly sales is not met, salespersons often are fired.

The pressure brought to bear on those receiving calls from Lloyd, Carr is enormous. In the set-up call, the primary objective is to "qualify" the prospect by determining the extent of his resources and interest. This initial contact is intended to stimulate interest by emphasizing the get-rich-quick potential of commodity options. Toward that end, callers have made a number of false, deceptive, or misleading representations, such as statements that investors would double or triple their money if they invested now, that the most conservative estimates call for the price of a particular commodity to rise by 100 to 200 percent within one year, and that every time the market price of a commodity rises, the investor makes large profits. The record contains a number of references to statements made by Lloyd, Carr salespersons that the

which means every time the price of sugar goes up by one penny per lb., it returns to you, the investor, $1102. So, to carry this one step further, let us say that only those most conservative projections hold forth, and sugar only reaches the upper twenties, never mind higher, as most analysts expect: Well that means we're talking about 19, 20, 21 thousand dollars or more, return on capital in about a year, with long term capital gains. Would that be of interest to you Mr. _____? Well fine. In that case, I have some material here on the sugar market, explaining in detail why sugar prices are going up, and how you can make a great deal of money as a result. Also, some information about commodity options as an investment tool, both the benefits, and the risks, and a little information about our firm, Lloyd, Carr & Co., who we are, what we do, how we do it, and how 82% of our clients made a profit last year; I hope you'll agree that's not too bad a batting average? _____ I'm going to drop this in the mail to you. I want you to take a serious look at this, and I'll get back to you in a few days, and discuss the situation in detail. Let's see, today is _____, so if I mail this out to you today, you'll receive it on _____. I'll give you a call on _____. What time is convenient for you on _____? Fine I'll call you at _____ on _____.

By the way, my friends call me _____. What do your friends call you?

_____; some of this material may be new and unfamiliar to you, so do yourself a favor, and write down any and all questions about anything which is the least bit unclear to you and when I speak to you on _____, I'll answer all your questions.

Again, this is _____ with Lloyd, Carr & Co.; nice talking to you, and I'll speak to you on _____.

P.S.

Two points to note about this particular cold call.

1. It qualifies the prospect in terms of interest and not in terms of money, something we have been rather lax in, resulting in a great deal of mail being sent to unqualified people.

2. There is a logical flow and progression in this approach, which seems to result, in the prospect remembering most of what he was told on the cold call, when the second call is made."

investor is in a can't-lose position by purchasing commodity options.

Following the initial contact, the prospect sometimes receives a number of pamphlets and other sales literature. Like the set-up calls, this literature contains several misleading representations. It is stated, for example, that: (1) The London options offered by Lloyd, Carr are guaranteed by the International Commodities Clearing House (ICCH). In fact, only member firms of London exchanges are protected against default by the ICCH, and Lloyd, Carr is not a member. (2) The investor realizes a profit for every increase in the price of the commodity future underlying the option. In point of fact, no profit is realized until the price moves above a break-even point which is substantially above the market price due to Lloyd, Carr's excessive premiums. (3) Lloyd, Carr offers discounts off going option prices. In truth, the prices Lloyd, Carr charges are substantially higher than those charged by other dealers. In Michigan, for example, Lloyd, Carr charges approximately $8,000 for a single option while other firms charge approximately $2,500 for the same item. (4) Investment in commodity options offers limited risk. Such investments are, however, actually highly speculative. The only limitation of risk involves a limited *loss* potential since an investor could refuse to exercise his option if the market price fell below the strike price, thus limiting his loss to the premium and commission paid. Since Lloyd, Carr charges a premium of as much as $10,000, however, the loss can clearly be destructive to some investors. Moreover, by trading in options the investor sacrifices the opportunity to profit on small increases in market price. (5) Lloyd, Carr is "long known for the quality, depth and reliability of its research; the training, motivation, knowledge and integrity of its brokers; the magnitude and liquidity of its capital assets; and the efficiency of its coast to coast offices and incomparable worldwide communication network . . .." In fact, Lloyd, Carr

was founded only in June or July of 1976. At the time the statement regarding Lloyd, Carr's "long known" qualities was first published, the company had been in existence for approximately six months.

Shortly after receiving the sales literature, prospects are usually deluged with phone calls in an attempt to consummate a sale. It is apparent from the record that salespersons wilfully make any misrepresentations necessary to effect a sale.

It is frequently stated that last year 82 percent of Lloyd, Carr's customers made money. In point of fact, one of Lloyd, Carr's operations' leaders testified that the reference to 82 percent represented only that percentage of about 200 customers in 1976, and that the figure was intended to suggest that that percentage did not *lose* money. Several customers have indicated that they were continuously given the impression that their investment was guaranteed, when in fact, of course, no such protection exists. Moreover, prospective customers are assured prior to purchasing an option that Lloyd, Carr will keep in constant touch with them regarding their investment. Once the money has changed hands, however, investors often find it next to impossible to contact the salesperson with whom they dealt. Rather, a different salesperson takes any inquiries. Should the investor ask to speak with his original salesperson, he is often told that that individual no longer works for Lloyd, Carr,[8] or some other excuse, such as "he was recently involved in an automobile accident and will be hospitalized indefinitely." If at that point the investor questions the new contact about the wisdom of his original investment, it is not unusual for that salesperson to begin another sales pitch, confirming that the original investment will probably result in a total loss and that the investor should buy a second option to cover his losses. This process is often repeated with still other salespersons.

---

8. That phenomenon is not unlikely in light of the rapid turnover of personnel Lloyd, Carr experiences. See text, *supra.*

Salespersons do not disclose the mark-up on the options. Indeed, it appears that salespersons are not told themselves what the mark-up is. If asked, it is divulged that commissions range between 10 and 30 percent. Actually, the total mark-up ranges between 300 and 400 percent.

Salespersons are not subtle in attempting to induce potential customers to act quickly. If a customer ultimately agrees to purchase an option, Lloyd, Carr sends out a messenger to his home or business within a few hours of the telephone call to pick up payment. Often, however, orders are not filled for several days.

The overriding flavor of the solicitations, and that which makes them patently deceitful, is the unrestrained and unambiguous prediction of certain or enormous profits. Potential investors are inundated with assurances of large, low-risk gains. There is no attempt on the part of Lloyd, Carr salespersons to counsel their clients or to consider financial positions so that it can be determined whether they can realistically afford to enter the commodities market. The one and only concern is sell, sell, sell. Unsubstantiated predictions of increases in the market prices of whatever commodity is being pushed are made to sound like calculated fact to potential investors. In many cases, explanatory literature—some of which may in fact be helpful, as indicated below—is never sent despite promises to the contrary. In almost no cases is there an adequate explanation of how the commodity options market operates so that prospects can become aware of how much the market price of the commodity must increase before a break-even point is reached. Instead, sellers give the impression that profits are reaped with every price rise, however incremental it might be.

It does appear that Lloyd, Carr has attempted to provide sufficient disclosure in two items sometimes mailed to potential customers. It is expressly stated in one leaflet that the purpose of the publication is to conform with Rule 32.5 adopted under the 1974 amendments to the Commodity Exchange Act. Lloyd, Carr therein informs investors that:

RISK

*No individual or firm, even with the experience and extensive research and world-wide communication facilities Lloyd Carr possesses, can with certainty predict specific market movements of the futures contract or the commodity underlying the option offered.*

ACCORDINGLY, AND BECAUSE OF THE VOLATILE NATURE OF THE COMMODITIES MARKET, THE PURCHASE OF COMMODITY OPTIONS IS NOT SUITABLE FOR MANY MEMBERS OF THE PUBLIC. AN INVESTOR SHOULD NOT PURCHASE A COMMODITY OPTION UNLESS HE IS AWARE OF THE POTENTIAL FOR LOSS, IS PREPARED TO SUSTAIN A TOTAL LOSS OF THE PURCHASE PRICE OF THE OPTION WHICH WILL OCCUR SHOULD THE PRICE OF THE UNDERLYING FUTURES CONTRACT NOT MOVE BEYOND THE STRIKE PRICE IN THE ANTICIPATED DIRECTION AND UNDERSTANDS THE NATURE AND EXTENT OF HIS RIGHTS AND OBLIGATIONS.

*Yet the volatility of these markets is one of the compelling reasons we do recommend to those who meet the requirements, the purchase of commodity options, which couple high leverage and unlimited profit potential with assurance of known and limited loss possibility and elimination of margin calls. This assurance is totally absent from entry into straight commodity futures contracts and makes speculation in the latter infinitely more unsuitable, even foolhardy, for a far greater number of investors.*

THESE COMMODITY OPTIONS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE COMMODITY FUTURES TRADING COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS STATEMENT. ANY REP-

RESENTATION TO THE CONTRARY IS A VIOLATION OF THE COMMODITY EXCHANGE ACT AND THE REGULATIONS THEREUNDER.

LLOYD CARR BELIEVES, HOWEVER, AND HAS BEEN ADVISED BY LEGAL COUNSEL, THAT THE STATEMENTS AND INFORMATION CONTAINED HEREIN ARE IN FULL CONFORMITY WITH DISCLOSURE SEC. 325 OF THE RULES AND REGULATIONS ISSUED UNDER THE COMMODITY FUTURES TRADING ACT OF 1974.

This language does in fact conform with Rule 32.5(5).

This disclosure does not suffice to save Lloyd, Carr's operations, however. First, there is no disclosure of the actual cost to the customer broken down into the various components including fees, commissions, or any other charges. Second, it is apparent from the description of the overall sales activities presented above that disclosure of risk was not emphasized, indeed it was generally omitted entirely. Salespersons were neither interested in performing nor qualified to undertake the necessary fiduciary responsibilities that inhere in the investment advisor field. Moreover, Lloyd, Carr management actively encouraged the types of pressure sales tactics used exclusively. Lloyd, Carr represents in one of its publications that "our high standards of moral responsibility and zealous desire to protect the confidence and reputation for integrity we have earned from our clients and the investing public, dictate that we not only emphasize the unusual profit potentials [options] transactions may offer, but carefully and candidly indicate the inherent risk and cost factors." There can be no doubt that this policy was not adhered to, and that the "high standards of moral responsibility" are in dramatic need of reappraisal.

## II. CONCLUSIONS OF LAW.

In light of this factual background, it is not difficult to pass on plaintiffs' motions for preliminary injunctive relief. All factors point to the conclusion that the motions should be granted. Indeed, in a brief filed with the court defendants Lloyd, Carr & Co. and James A. Carr admitted that Lloyd, Carr "has thus far been unable to conform its business practices to the dictates of this Act [the Commodity Exchange Act]."

Plaintiff Attorney General brings this action under 7 U.S.C. §§ 6c(b), 6o and 17 CFR § 32.9. There is no longer any doubt that a private cause of action exists under the Commodity Exchange Act. *See Case & Co., Inc. v. Board of Trade of City of Chicago,* 523 F.2d 355 (7th Cir. 1975). Plaintiff C.F.T.C. brings its action pursuant to § 13a–1 of the Commodity Exchange Act. That section provides that:

"Whenever it shall appear to the [C.F.T.C] that any . . . person has engaged in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, . . . the [C.F.T.C.] may bring an action in the proper district court of the United States . . . to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation, or order thereunder . . . . Upon a proper showing, a permanent or temporary injunction . . . shall be granted without bond."

Since this provision closely parallels the language in both the Securities Act of 1933 and the Securities Exchange Act of 1934 permitting enforcement actions by the Securities and Exchange Commission,[9] it often has been stated that "case law developed under the securities laws is pertinent to cases under § 13a–1 of the Act." *Commodity Futures Trading Comm'n v. J. S. Love & Assoc.,* 422 F.Supp. 652, 661 (S.D.N.Y.1976). *See Commodity Futures Trading Comm'n v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911, 919 (S.D.N.Y.1977); *Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 422 F.Supp. 662, 664 (S.D.N.Y.1976).

With respect to the C.F.T.C.'s motion, therefore, the standard governing the issuance of an injunction in the securities

---

9. 15 U.S.C. §§ 77t(b), 78u(e).

area must be examined. A number of cases have held that since SEC injunctive suits are expressly authorized by statute, proof of irreparable injury or the inadequacy of other remedies is not required. *See Securities and Exchange Comm'n v. Management Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir. 1975); *Securities and Exchange Comm'n v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1102 (2d Cir. 1972). *See generally* III L. Loss, *Securities Regulation* 1979 (1961, Supp.1969). Instead, the standard adopted by these courts generally requires a showing that illegal activity has occurred and that there is a reasonable likelihood that the wrong will be repeated. In *Management Dynamics, supra,* the court stated:

"The rationale for this rule is readily apparent. It requires little elaboration to make the point that the SEC appears . . . not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws. Hence, by making the showing required by statute that the defendant 'is engaged or about to engage' in illegal acts, the Commission is seeking to protect the public interest, and 'the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief.'

. . . To a large extent, then, a finding that future violations are likely to occur implies that a significant injury to the public has been shown to the judge's satisfaction. But insofar as it is argued that a greater showing of irreparable injury is required if the defendant's actions are to be enjoined, we believe the effective enforcement of the securities laws would be jeopardized if that principle were adopted." 515 F.2d at 808–809 (citations omitted).

■ It has been recognized that past illegal conduct is probative in deciding whether a likelihood of future violations exists. *See Manor Nursing Centers, supra; Securities and Exchange Comm'n v. Keller Corp.,* 323 F.2d 397 (7th Cir. 1963). Nonetheless, the totality of the circumstances must be considered to determine whether "there is a reasonable expectation that the defendants will thwart the policy of the [securities laws] by engaging in activities proscribed thereby." *Securities and Exchange Comm'n v. Texas Gulf Sulphur Co.,* 312 F.Supp. 77, 87 (S.D.N.Y.1970).

■ This standard has been directly applied by the courts that have considered motions for injunctive relief in cases arising under the Commodity Exchange Act. *See e. g., Crown Colony, supra,* at 919; *J. S. Love, supra,* at 661. That such an application is correct is clear in light of the nearly identical wording of the statutory provisions authorizing injunctive relief, the similarities between the responsibility of the SEC and the C.F.T.C., and the necessity under both the securities and commodities laws that the public interest be protected. It is my view that this standard is the appropriate one to employ when a regulatory agency is authorized to enforce a federal statute in the courts. I fully agree with the reasoning of the Second Circuit Court of Appeals in the *Management Dynamics* case.

Under this standard it is obvious that preliminary injunctive relief is warranted. In *Crown Colony, supra,* Judge Weinfeld was faced with a set of facts almost identical to that before me in this case. Crown Colony was in the commodity options business, and the C.F.T.C. sought an injunction against alleged fraudulent activities. Among the C.F.T.C.'s contentions were Crown Colony's boiler room, high-pressure sales tactics, failure to fully disclose the risk involved, and failure to set forth the fees and commissions charged. The court concluded that "the plaintiff has abundantly established its charges that the defendants, singly and in concert with one another, engaged over an extended period in acts and practices proscribed by the Commodity Act and the rules adopted by the Commission thereunder." 434 F.Supp. at 913. Employing the "likelihood that the wrong will be repeated" standard, Judge Weinfeld granted a preliminary injunction.

Similarly, in *J. S. Love, supra* the court dealt with charges by the C.F.T.C. that the defendants had violated the anti-fraud provisions of the Commodity Exchange Act. Shortly after the suit was commenced, all defendants other than an individual officer in defendant corporations consented to the entry of an order of permanent injunction enjoining them from violating the anti-fraud provisions of the Commodity Exchange Act, without admitting or denying the allegations in the complaint with respect to the remaining individual defendant, the standard set forth in *Management Dynamics* was again considered appropriate. The court concluded, however, that a preliminary injunction should not issue. Considering the totality of the circumstances, it was felt that since the individual had no control over the allegedly fraudulent sales literature, and relied on counsel's advice regarding certain advertisements, "the purposes served by issuance of a preliminary injunction are outweighed by the 'harmful impact on the personal reputation . . . and legitimate business activities' of the defendant. *SEC v. Harwyn Industries Corp.*, 326 F.Supp. 943, 957 (S.D.N.Y. 1971)." 422 F.Supp. at 662.

The results reached in *Crown Colony* and *J. S. Love* are entirely consistent. In *Management Dynamics* it was expressly stated that even though the traditional test for preliminary injunctions was not appropriate in suits brought pursuant to statute by a regulatory agency, "[we] scarcely mean to imply that judges are free to set to one side all notions of fairness because it is the SEC, rather than a private litigant, which has stepped into court." 515 F.2d at 808. Moreover, the court further indicated that it "need not delineate the precise standards for those cases in which the fact of violation and the likelihood of future infractions are not as clear as in the case at bar. Suffice it to say that in such cases the district court will attach greater weight to traditional equitable principles in arriving at its conclusion." *Id.* at 809, n.5.

■ The case before me falls within that category in which the fact of violation and the likelihood of future infractions are clear. The C.F.T.C. has succeeded in showing a number of egregious, inexcusable violations of federal law. It is hard to imagine a more straightforward prohibition against fraud than § 32.9 of the rules promulgated under the Commodity Exchange Act. I deem it inherently fraudulent for an organization like Lloyd, Carr to make bold predictions of astronomical returns on investment in a field as speculative and uncertain as commodity options. *See United States v. Wolfson*, 405 F.2d 779 (2d Cir.), *cert. denied*, 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1968); *United States v. Herr*, 338 F.2d 607 (7th Cir. 1964), *cert. denied*, 382 U.S. 999, 86 S.Ct. 563, 15 L.Ed.2d 487 (1966). In addition, of course, the plethora of specific misrepresentations and omissions discussed above clearly falls within the purview of Rule 32.9. Moreover, there are indications that defendants continued their operations unaltered even in the face of a temporary restraining order. I have no hesitation in stating that a preliminary injunction should be granted on the basis of the "likelihood of future violations" standard.

■ With respect to the Michigan Attorney General, it is not as readily apparent that the above standard is applicable. The Attorney General has standing to sue for an injunction not pursuant to express statutory authorization as does the C.F.T.C., but on the basis of an implied cause of action under the Commodity Exchange Act and the *parens patriae* doctrine. In my view, however, the rationale behind the standard supports a conclusion that the test is equally applicable to the Attorney General's motion for a preliminary injunction. As noted, the Attorney General has standing under the *parens patriae* doctrine. Under that doctrine, a state may act on behalf of its citizens in a lawsuit if its sovereign or quasi-sovereign interests are implicated. Inherent in the concept of quasi-sovereign interests is protection of the public interest. Surely some of the most basic of a state's quasi-sovereign interests include maintenance of the integrity of markets and exchanges operating within its boundaries,

protection of its citizens from fraudulent and deceptive practices, support for the general welfare of its residents and its economy, and prevention of its citizens' revenues from being wrongfully extracted from the state. *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 260–62, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), *Georgia v. Pennsylvania Rr. Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). This is not a case in which the state is gratuitously attempting to prosecute purely personal claims of its citizens, *see Pennsylvania v. New Jersey*, 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976), but rather is one in which the state is seeking to protect the public interest. Accordingly, the policy permitting a federal regulatory agency to sue for injunctive relief without reference to all of the elements of the traditional standard for preliminary injunctions applies to a state's *parens patriae* suit as well.

The Sixth Circuit Court of Appeals has neither accepted nor rejected the standard discussed above. In *Securities and Exchange Comm'n v. Senex Corp.*, 534 F.2d 1240 (6th Cir. 1976), however, the court applied the traditional guidelines for the exercise of judicial discretion in considering a motion for preliminary injunctive relief. The SEC sued in that case for an injunction enjoining defendants from violating the anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. The court did not cite *Management Dynamics* or discuss the possibility that SEC enforcement suits might call for a standard different from that employed in private suits for injunctive relief. Even if the law in this Circuit still requires consideration of the traditional elements regarding preliminary injunctions, however, I conclude that preliminary injunctive relief is warranted in this case.

The four elements of which the traditional test is comprised were set forth by the

Sixth Circuit most recently in *Mason County Medical Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977):

   (1) whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits; [10]

   (2) whether the plaintiffs have shown irreparable injury;

   (3) whether the issuance of a preliminary injunction would cause substantial harm to others;

   (4) whether the public interest would be served by issuing a preliminary injunction.

Much of the prior discussion is relevant at this point. It has been clearly indicated above that plaintiffs have shown a substantial likelihood of success on the merits. It would be superfluous to repeat those observations. Suffice it to say here that the record is replete with uncontradicted or unimpeached testimony, affidavits, and exhibits showing recurrent violations of the Commodity Exchange Act by defendants. This is more than adequate to satisfy the first element of the standard.

I have also thoroughly presented my view that the public interest would be served by issuing a preliminary injunction, thus satisfying the fourth element. The very basis of plaintiff Attorney General's standing, the *parens patriae* doctrine, depends upon a showing that the public interest is implicated. Similarly, the C.F.T.C. was established as an independent federal regulatory agency to administer the Commodity Exchange Act and thus act as a statutory watchdog, thereby providing a safeguard for the public interest. In light of the fact that these plaintiffs have succeeded in showing a probability that the Commodity Exchange Act is being violated by defendants, there is no doubt that the public interest will be served by the issuance of the preliminary injunction.

---

**10.** The court noted that it had "used unfortunate terminology" in *Senex* "when it stated that one of the four standards or prerequisites for the equitable relief of a preliminary injunction is that there must be a 'possibility' of success on the merits. A showing of a mere 'possibility' of success would render the test . . . virtually meaningless. Therefore, we reiterate that the plaintiffs must demonstrate a strong or substantial *likelihood* or *probability* of success on the merits." at 563 F.2d 261.

■ The second and third elements of the test are also met here. When a suit is brought on behalf of the public, the irreparable injury which a court must take into account refers to irreparable *public* injury. *See Securities and Exchange Comm'n v. Senex Corp.*, 399 F.Supp. 497, 508 (E.D.Ky. 1975), *aff'd*, 534 F.2d 1240 (6th Cir. 1976). The public must certainly be protected from fraudulent activities such as those shown by plaintiffs. While some investors may be able to recover money damages, thousands of others will not. Moreover, the public injury that occurs as a consequence of the impairment of the integrity of markets and exchanges is a most obvious example of irreparable damage. Plaintiffs would be in derogation of their responsibilities and duties as guardians of the public interest if they did not seek cessation of fraud.

There has been no indication that a preliminary injunction would adversely affect others to the extent of causing substantial harm. It has been stated that in cases involving protection of the public, the district court "should recognize that the public interest, when in conflict with private interest, is paramount." *Securities and Exchange Comm'n v. Culpepper*, 270 F.2d 241, 250 (2d Cir. 1959).

In summary, I conclude that under either the traditional guidelines or the alternative standard established for statutory enforcement actions brought by regulatory agencies, preliminary injunctive relief is appropriate in this case. "[C]rass and callous . . . indifference to the law, to the needs and circumstances of their customers, and to the public interest in the area of commodity option trading"[11] cannot be tolerated. The day when investors must keep their guard up or be fleeced has long passed. Dealers and advisors in commodity options must be held to the highest fiduciary standards. By passing the 1974 Commodity Futures Trading Commission Act to amend the Commodity Exchange Act, Congress sought to create "an agency comparable in stature and responsibility to the SEC."[12] Just as the federal securities laws are intended to do, the 1974 Commodities Act amendments are meant "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the [commodities] industry." *Securities and Exchange Comm'n v. Capital Gains Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963). Selling techniques that are aimed to snow the unsophisticated customer "into parting with funds, often borrowed, which they could ill-afford to invest even in far safer enterprises,"[13] have no place in a regulated industry.

## THE STATE LAW CLAIMS

Plaintiff Attorney General asserts two claims arising under state law. The first is based on the Michigan Uniform Securities Act, M.C.L.A. §§ 451.501 *et seq.* (1977) and the second on the Michigan Consumer Protection Act, M.C.L.A. §§ 445.901 *et seq* (1977). Without contesting the merits of these claims, defendants argue that these state statutes are preempted by the federal Commodity Exchange Act. Plaintiff responds that defendants are estopped from asserting the defense of preemption because they have failed to register with the C.F.T.C., thereby refusing to submit to federal jurisdiction.

It is unnecessary for me to decide the preemption question now. I have indicated above that the Attorney General's motion for preliminary injunctive relief is granted on the basis of his claims under the Commodity Exchange Act. The entirety of the Attorney General's prayer for relief can be considered in connection with his federal claim. Accordingly, at this preliminary stage in the proceedings it would be rather gratuitous for me to pass on what appears

---

**11.** *Commodity Futures Trading Commission v. Crown Colony Commodity Options, Ltd.*, 434 F.Supp. 911, 919 (S.D.N.Y.1977).

**12.** 120 Cong.Rec. 51886 (93d Cong., 2d Sess., Oct. 10, 1974), (remarks of Sen. Talmadge).

**13.** *SEC v. Galaxy Foods, Inc.*, 417 F.Supp. 1225, 1244 (S.D.N.Y.1976).

to be an important question regarding the always-delicate balance between federal and state regulatory authority.

## DUE PROCESS

█ ·Defendants have argued throughout the hearing on the motions for preliminary injunction that they have been deprived of a fair hearing as required by due process of law. It is necessary to briefly indicate that such contentions have no merit. It is clear that in some cases no evidentiary hearing at all is required, and that a preliminary injunction may be granted on the basis of affidavits alone. I agree with the recent observation that,

> "Rule 65(a) of the Federal Rules of Civil Procedure contemplates the introduction at a hearing on a preliminary injunction of evidence which would not be admissible in a final trial on the merits. This relaxation of the rule of evidence at the preliminary injunction stage is consonant with one of the key purposes of a preliminary injunction—the need for speedy relief. *Wounded Knee Legal Defense/Offense Committee v. FBI*, 507 F.2d 1281, 1287 (8th Cir. 1974)." *Securities and Exchange Comm'n v. General Refractories Co.*, 400 F.Supp. 1248, 1255 (D.D.C.1975).

In this case there has been a three-day hearing at which live witnesses testified and were subject to extensive cross-examination. Defendants were given ample time to put their own witnesses on the stand, and had sufficient opportunity to file affidavits and otherwise present their case.

In their attempts to articulate concern over an alleged lack of fairness, defendants' counsel have repeatedly misrepresented the court's statements, both in oral argument and in sworn affidavits. It was stated, for example, that the Court ruled that discovery in advance of the preliminary injunction hearing is not permissible. This court never so ruled, and it was frequently emphasized on the record that no such ruling had been made. Nonetheless, defendants' counsel filed an affidavit including that assertion.

It was also sworn to by defendants' counsel that the court extended its Temporary Restraining Order of November 7, 1977 to include the C.F.T.C.'s Motion therefor without defendants having an opportunity to be heard or the C.F.T.C. having filed its complaint. In fact, the record clearly indicates that (1) defendants were present and were heard at the hearing on November 4, 1977 during which the C.F.T.C. argued for intervention and the granting of its motion for temporary restraining order; (2) the C.F.T.C.'s complaint had been filed well before its motion was granted; and (3) intervention was ordered from the bench on November 7, 1977, during the same hearing at which the temporary restraining order was granted. A written order granting intervention was issued the next day. My opinion of November 14, 1977 fully explained the reasons for granting the temporary restraining order and explicitly stated that it was intended to enjoin defendants' alleged unlawful activities nationwide, as moved by intervenor C.F.T.C.

Statements such as those referred to in the preceding two paragraphs are indicative of defendants' attempts throughout these proceedings to shift the focus of inquiry away from the cardinal issues; those issues involve plaintiffs' allegations of fraud and deceit on the part of defendants. I have consistently made it clear that there should be no diversions from the crux of this case prior to, or during, the hearing on plaintiffs' preliminary injunction motions. In a telephone conference among all the attorneys and myself I stated that the court would "proceed only on the issues that are before [it] with reference to the scope of the allegations in the Complaint and the affidavits of the people who spoke through their affidavits in this matter. And any collateral matter can later be resolved, and it must not come up in this proceeding. And this is the order the court so orders."

I have also refused to permit plaintiffs to argue a contempt of court motion prior to the conclusion of the preliminary injunction hearing. Matters collateral to the primary questions at hand tend to distract the court's and the litigants' attention from the

real issues. It is on the real issues that the parties should dwell.

RELIEF

(1) Defendants will be preliminary enjoined from further violations of the Commodity Exchange Act. An order will be entered fully describing the proscribed activities.

(2) Defendants will be prohibited from dissipating, concealing or disposing of, in any manner, any of their assets, choses in action or other property, except as to the partnership defendants such order will not preclude expenditures in the ordinary course of business, and as to the individual defendants such order would not prohibit expenditures for ordinary and necessary living expense.

(3) Defendants will be prohibited from destroying, mutilating, concealing, altering, or disposing of, in any manner, any of the books, records, documents, correspondence, brochures, manuals, obligations, or other business-related literature.

(4) Plaintiff C.F.T.C. moves for an order allowing its representatives to have access to and inspect the premises, books, records, and accounts of Lloyd, Carr. Such inspections are expressly provided for in Rule 32.7, 17 CFR § 32.7. There is some indication in the record, that defendants have refused to permit the C.F.T.C. access to their records. I order defendants to fully comply with Rule 32.7(e).

(5) Plaintiffs have also moved for orders, (1) appointing a receiver to take control of the Lloyd, Carr operations; (2) directing an accounting; (3) directing disgorgement of all monies received from any illegal activities by defendants. These motions will not be granted at this stage. It must be emphasized that this case is only at the preliminary injunction level. The merits have not yet been considered. It is premature, therefore, to entertain motions such as these, which would have a drastic effect upon defendants' business.

(6) In an affidavit filed with the court it is stated that between January 1, 1977 and July 31, 1977, defendants Carr and LeMieux withdrew more than $1.3 million from Lloyd, Carr & Co. through their personal drawing accounts. If this is an accurate statement, it is clear that the company's assets are being seriously depleted, and relief such as disgorgement, which might be considered following a trial on the merits, could be made less effective. Accordingly, I will appoint a special master to inquire into the accuracy of such statements, and to report back to this court at the conclusion of his investigation.