**Frank J. KELLEY and Commodity Futures Trading Commission, Plaintiffs,**

v.

**James A. CARR and Charles P. LeMieux, III, dba Lloyd Carr & Co., a partnership, James A. Carr and Charles P. LeMieux, III, dba Lloyd Carr Financial Co., a partnership, James A. Carr, a/k/a Alan Abrahams, Charles P. LeMieux, III, Defendants.**

No. G77–550 C.A.

United States District Court,
W.D. Michigan, S.D.

June 14, 1983.

Dina L. Biblin, Washington, D.C., for CFTC.

## OPINION

NOEL P. FOX, Senior District Judge.

Presently before the court is plaintiff Commodity Futures Trading Commission's ("Commission") motion for summary judgment. The Commission seeks permanent injunctive relief, the appointment of an Equity Receiver, an accounting, and an order directing all defendants to disgorge to the Receiver all benefits derived from the violative actions discussed below.

## BACKGROUND

This case originated on October 13, 1977, when Michigan Attorney General Frank J. Kelley ("Kelley") filed a complaint against defendants in the Circuit Court for Ingham County, Michigan. The complaint charged violations of the anti-fraud and other provisions of the Michigan securities and consumer protection statutes in defendants' solicitation and sale of options on futures contracts for London commodities. On October 31, 1977, defendants removed to this

court, and on November 2, 1977, the State amended its complaint to include violations of the anti-fraud provisions of the Commodity Exchange Act as amended by the Commodity Futures Trading Commission Act, Pub.L. 93–463, 88 Stat. 1389, 7 U.S.C. §§ 1–22.

A temporary restraining order was granted by this court on November 7, 1977, upon the amended complaint of Kelley, and the Commission was granted leave to intervene on November 8, 1977. The Commission's complaint included three counts: fraud in connection with the sale of commodity options, under 17 C.F.R. § 32.9; failure to disclose required information, under 17 C.F.R. § 32.5; and failure to secure prompt execution of commodity option orders, under 17 C.F.R. § 32.8(c). The Commission also requested relief in the form of an injunction against further violations of the Act, the appointment of a Receiver for Lloyd Carr & Co., an accounting, disgorgement, and a protective order *pendente lite.*

On December 5, 1977, the court granted the preliminary injunction requested by the Commission, enjoining defendants from defrauding and deceiving customers with misleading information, and from destroying records. *Kelley v. Carr,* 442 F.Supp. 346 (W.D.Mich.1977), *aff'd in part and rev'd in part,* 691 F.2d 800 (6th Cir.1980). It also compelled the defendants to provide the Commission access to Lloyd Carr & Co. records and to give notice of the injunction to all employees. In addition, a Special Master was appointed.

Subsequent to this preliminary injunction, Lloyd Carr & Co. branch offices in a number of cities failed to provide the Commission access to records as mandated, and on January 9, 1978, the U.S. Attorney for the Western District of Michigan and the Commission filed an application for an order to show cause why defendants and other Lloyd Carr employees should not be held in criminal contempt. On or about January 10, 1978, defendant Carr, a/k/a Alan Abrahams ("Abrahams")[1] was taken into federal custody on the contempt citation, and upon discovery of his true identity, was also held as an escaped fugitive from New Jersey. On January 19, 1978, Lloyd Carr & Co. and Lloyd Carr Financial Co. were placed in equity receivership in a pending injunctive action filed by the Commission in Boston against the same defendants as in the instant action.[2]

On January 30, 1978, on the motions of plaintiffs Kelley and the Commission, this court amended its preliminary injunction to terminate all solicitation and sales activities of the defendants, as a result of information received which indicated additional fraud, and the discovery of Abrahams' aliases and outstanding state and federal charges. At the same time the appointment of the Master was vacated, in deference to the appointment of the Receiver by the Federal District Court in Boston.

Following a hearing on the contempt question, this court found defendants in contempt for violation of the earlier order.[3] Defendant Abrahams received a six-month

---

1. When arrested on this contempt charge in Massachusetts and fingerprinted, James Carr was found to be Alan Abrahams, an escaped fugitive from a New Jersey prison.

2. *Commodity Futures Trading Commission v. James A. Carr and Charles P. LeMieux, III, d/b/a Lloyd Carr & Co., Lloyd Carr Financial Co., James A. Carr, and Charles P. LeMieux, III,* No. 77–371–Z (D.Mass. filed 2/8/1977). This action was an injunctive action alleging sales of commodity options in the absence of proper registration with the Commission, and failure to permit inspection of books and records by Commission employees.

On or about February 1, 1978, the companies were placed in involuntary bankruptcy receivership, with Walter McLaughlin Sr., the Equity Receiver appointed in the injunctive case, appointed as bankruptcy receiver/trustee. An involuntary bankruptcy petition was also filed against Alan Abrahams. *In re Alan Abrahams and Lloyd, Carr & Co.,* Nos. 78–204–Z, 78–208–Z, 78–209–Z (D.Mass. filed 2/1/1978).

3. James A. Brien, Michael D. Schuster, and Ralph R. Zolla were also found in contempt. They were office managers and employees of Lloyd, Carr offices around the country that violated the injunction, but are not named defendants in this action. They were later con-

prison sentence, which was added to the sentence he was then serving for crimes in New Jersey.[4] Abrahams has since pled guilty, in the Southern District of New York, to a multi-count mail and wire fraud conspiracy based on the same activities alleged in the Commission's pleadings in this action. He received 54 months additional prison time. *United States v. Abrahams,* 79 Cr. 425 (WCC) (S.D.N.Y. 3/31/80). Abrahams was recently released from the Federal Correctional Institution at Raybrook, New York.

James A. Brien, Michael D. Shuster, Thomas Labus, Robert Ralph Zolla and Stephen Buzzi, all former management employees of Lloyd Carr & Co. were convicted, pursuant to the same indictment to which Abrahams pled, of conspiring to commit mail and wire fraud in connection with their Lloyd Carr & Co. activities. *United States v. Brien,* 617 F.2d 299 (1st Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980).

Defendant LeMieux, although served with the complaint and summons, has never entered an appearance in this case, and his whereabouts are apparently unknown. Default was entered against him by the Clerk on March 2, 1983. A motion for default judgment is now pending.

A full description of defendants' activities can be found in this court's opinion published at 442 F.Supp. 346 and the First Circuit's opinion in *U.S. v. Brien,* 617 F.2d 299.

## MOTION FOR SUMMARY JUDGMENT

Plaintiff Commission has now filed a motion for summary judgment seeking permanent injunctive relief, appointment of an Equity Receiver, an accounting, and an order directing all defendants to disgorge to the Receiver all benefits derived from their violative activities in this action. On a motion for summary judgment, the movant has the burden of showing conclusively that there exists no genuine issue as to material fact and that the moving party is entitled to summary judgment as a matter of law. *Smith v. Hudson,* 600 F.2d 60 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979); *Tee-Pak, Inc. v. St. Regis Paper Co.,* 491 F.2d 1193 (6th Cir. 1974); Fed.R.Civ.P. 56(c). Rule 56 applies to government enforcement actions for injunctive relief, like the instant action, as well as other types of civil litigation. *See, e.g., Commodity Futures Trading Commission v. Savage,* 611 F.2d 270, 282 (9th Cir. 1979); *Securities & Exchange Commission v. Research Automation Corp.,* 585 F.2d 31, 33–34 (2d Cir.1978).

The purpose of this procedural device is not to permit the court to decide issues of fact, but to decide whether any material issues of fact are actually in dispute. *Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425 (6th Cir. 1962). In determining whether there are issues of fact requiring a trial, "the inferences to be drawn from the underlying facts contained in [the affidavits, attached exhibits and depositions] must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Even if the basic facts are not disputed, summary judgment may be inappropriate when contradictory inferences may be drawn from them. *Diebold, supra; Equal Employment Opportunity Commission v. United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry Local 189,* 427 F.2d 1091, 1093 (6th Cir.1970). In making this determination, the court must make refer-

---

victed of mail and wire fraud based on their activities in connection with Lloyd, Carr & Co., which conviction was upheld on appeal. *United States v. Brien,* 617 F.2d 299 (1st Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980).

4. Abrahams had been serving a sentence for aiding and abetting the obtaining of money under false pretenses in New Jersey when he escaped from prison. Under the alias "James A. Carr" he formed Lloyd, Carr & Co. and Lloyd Carr Financial Corp.

ence to the entire record and all well-pleaded allegations are to be accepted as true. *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389 (6th Cir.1975).

■ To avoid a motion for summary judgment, the defending party must plead specific facts establishing that there is a genuine controversy regarding material facts of the case. Fed.R.Civ.P. 56(e). It may not rest upon mere allegations or denials in its pleadings and it is insufficient to merely allege in a general or conclusory fashion that issues of fact exist or might exist. *Id.; First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Bryant v. Commonwealth of Kentucky,* 490 F.2d 1273 (6th Cir.1974). "[E]ven in suits for injunctive relief, the district courts should not hesitate to grant a plaintiff's request for summary judgment when the defendant has failed to meet the requirements prescribed by Rule 56(e). And this principle is not diluted simply because the [Securities & Exchange] Commission is the moving party." *Securities & Exchange Commission v. Research Automation Corp., supra,* 585 F.2d at 33–34.

The Commission relies on affidavits and declarations filed in this action as called for in Rule 56(e), and on testimony presented at the preliminary injunction hearings before this court on November 22–23, 1977. It also relies on facts admitted in defendants' answers to the complaints in this action. Many facts have already been determined in this or related litigation, *see Kelley v. Carr,* 442 F.Supp. 346; *In the Matter James A. Carr,* C.F.T.C. Dkt. 77–6, slip opinion (Aug. 1, 1977), and these facts are deemed conclusive under the doctrine of collateral estoppel, *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

■ Most of the material, substantive facts underlying the frauds alleged in the

Commission's complaint were admitted by defendant Abrahams, in his guilty plea before Judge Conner in the Southern District of New York. He pled guilty to a conspiracy count and six substantive mail and wire fraud counts. The counts of the indictment to which he pled encompass facts which also establish all three counts of the Commission's complaint in this action. This court has reviewed the transcript of the plea hearing to ensure that Abrahams' plea was knowing and voluntary. A knowing and voluntary plea of guilty to a criminal charge constitutes an admission of all the material facts alleged in the indictment or information. *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1170, 22 L.Ed.2d 418 (1969); *Kercheval v. United States,* 274 U.S. 220, 223, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927); *United States v. Rubin,* 243 F.2d 900, 902 (7th Cir.1957). Defendants are collaterally estopped from denying these facts. *Gray v. Commissioner of Internal Revenue,* 708 F.2d 243 (6th Cir. 1983).[5]

Defendants have not challenged the motion for summary judgment. On the record before the court, the following material facts are not in dispute and are therefore established.

FINDINGS OF FACT

From 1976, when Lloyd Carr Financial first began to sell options, until January 1978, when Lloyd Carr was placed in receivership and then bankruptcy, legions of inadequately trained telephone salespeople made thousands of unsolicited or "cold" calls to unsuspecting members of the public to solicit orders for London Commodity options sold through Lloyd Carr. Representing to customers Lloyd Carr's supposed commodities expertise, these salespeople, often reading from prepared scripts and assisted by misleading and incomplete promotional materials, provided to actual and

---

**5.** *Gray* was decided by the Sixth Circuit after the final draft of this opinion had been prepared. In deference to Judge Merritt's well-reasoned dissent in *Gray,* the court notes that the record overwhelmingly supports the court's factual findings even without reliance on Abrahams' guilty plea in *United States v. Abrahams.*

potential customers exaggerated predictions of huge, virtually certain profits that would follow the purchase of London options through the Company.

Lloyd Carr was a classic "boiler room" operation, utilizing:

> unqualified, improperly supervised salesmen; high pressure long distance telephone sales designed to induce hasty investor decisions by customers about whose financial conditions the salesmen knew very little; and heavy dealings in speculative [transactions] about whose [terms and] conditions there was little disclosure.

*Securities & Exchange Commission v. Charles A. Morris & Associates,* 386 F.Supp. 1327, 1336 (W.D.Tenn.1973). Here, as usual, the boiler room operation involved a high pressure sales organization selling speculative ventures to unsophisticated investors. Defendants did not require that their salespeople be experienced. Salespeople were given no substantive training in commodities trading theory. The only significant training was in *sales* techniques, with only a brief description of commodities. Salespeople labored under high pressure conditions intended to spur sales without regard to investor suitability. Their telephone calls consisted primarily of "canned" sales pitches. *See, e.g.,* 442 F.Supp. at 350–351 n. 7.

Naggingly repetitive phone calls were employed in an attempt to pressure customers into buying options. Customers were exhorted to act hastily to avoid missing out on profits. Prices were deliberately misquoted to convince customers that opportunities to profit had already been lost by the customers' inaction.

Defendants regularly solicited and made sales to individuals without regard to investor suitability. As a result, many persons invested and lost funds they could ill afford to invest in high-risk investment schemes. These sales resulted in large part from defendants' misrepresentations of risk, profitability, and the nature of the transactions involved.

In the course of their solicitations, Lloyd Carr salespeople failed to disclose, obscured, or simply misrepresented numerous material facts concerning the transactions. Examples include: the risks involved in options transactions; profit potentials; the size and nature of Lloyd Carr's fees and commissions; the size and reliability of the Lloyd Carr research department; the nature of the "break-even" point at which an option becomes profitable to the customer; the effect of foreign currency fluctuations; Lloyd Carr's registration status with the Commodity Futures Trading Commission; Lloyd Carr's reputation in the industry; and the nature of "one-half" option contracts sold to customers.

Misrepresentations took the form of statements made to customers by salespeople, misleading sales pitches, and misrepresentations contained in various sales literature given to customers. Misrepresentations were also inherent in the failure to disclose certain material information.

In some instances salespeople induced customers to purchase more than one option, by misrepresenting the additional options as "hedges" when, in fact, they were identical to the first option.

On other occasions, salespeople placed orders for customers without their knowledge or consent, or refused to return funds to customers by explaining that the funds had already been used to purchase options when the funds had, in fact, not been spent.

At least through December 1976, Lloyd Carr sold "naked" options [6] to customers without so informing them. The sale of

---

**6.** "A 'commodity option' is a contractual right to buy, or sell, a commodity or commodity future by some specific date at a specified, fixed price, known as the 'striking price.' ... In the plainest case, an option is created, or 'written,' by the owner of a commodity or commodity futures contract, who commits himself to sell his goods or contract. But an option can also be written by anyone else willing to take the chance that he will be able

naked options resulted in situations where customers had to look to Lloyd Carr, rather than an exchange member, for payment of any profits. Customers were led to believe that an actual London option had been purchased by Lloyd Carr, on their behalf. Customers were not informed of the risk involved in such a situation.

Defendants' fraudulent activities were not isolated instances of misconduct. Rather, they were pervasive and intentional acts done with the intent of defrauding unsuspecting investors. The actions took place on a massive scale. The Detroit office, alone, made more than seventy thousand calls in one month, at a cost of over fifty thousand dollars. Nationwide, telephone charges approached one million dollars monthly.

The vast majority of investors lost all of their investment. Only a very small number made any profit by investing through Lloyd Carr.

Defendants consistently failed to properly disclose the essence of the transactions being offered, including the duration of the options and the quantity and quality of the underlying commodities; the elements comprising the purchase price; the services provided for those charges; and the break-even point and how it differed from the striking price.

Defendants failed to provide a clear explanation of the effect of any foreign currency fluctuations on the transactions entered into.

Defendants often failed to send prospective purchasers a bold-faced disclosure of risk statement, or any other disclosure statement. When defendants made disclosure statements, they were generally made only *after* the deal was closed; were generally insufficient to overcome the repeated high-pressure misrepresentations and recommendations; and failed to disclose various material facts including cost components, *i.e.*, commissions, fees, and other charges.

Upon receipt of orders for commodity option transactions, defendants unreasonably failed to secure prompt execution of such orders. Orders were withheld for days or weeks prior to execution in the London markets, to the detriment of the customer.

In other instances, where customers ordered, and were told they were purchasing contracts for commodity options purchased on the London exchanges, defendants failed to purchase options, instead providing customers with naked options.

## CONCLUSIONS OF LAW

The history of commodity futures and options regulation and the Commodity Futures Trading Commission Act, was described as follows in *British American Commodity Options Corp. v. Bagley,* 552 F.2d 482, 485 (2d Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977) (hereinafter cited as *BACO v. Bagley*).

Before 1974, regulation of trading in commodity futures and options derived mainly from the Commodity Exchange Act, 7 U.S.C. §§ 1–17b (1970).[7] That Act empowered the Commodity Exchange Authority of the Department of Agriculture to administer certain limited regulations on trading in a number of agricultural commodities,[8] and completely banned options on them. 7 U.S.C. § 6c (1970). On October 23, 1974, Congress enacted the Commodity Futures Trading Commission Act, supra, which created the Commission as an independent regulatory agency with plenary rulemaking power. The Act also substantially broadened the field of regulation, to include virtually all "goods and articles,"

\* \* \* \* \* \*

The new Act perpetuated the old Act's absolute ban on option trading for the

---

to cover his obligation in the futures market, if the option purchaser decides to exercise the option. Such an option is described as 'naked.' "

*British American Commodity Options Corp. v. Bagley* 552 F.2d 482, 484–485 (2d Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977).

commodities listed in the old Act, 7 U.S.C. § 6c(a) (Supp. V, 1975), but permitted other options to be written and to trade in compliance with rules promulgated by the Commission. 7 U.S.C. § 6c(b) (Supp. V, 1975). The Act authorized the Commission "to make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of this chapter." 7 U.S.C. § 12a(5) (Supp. V, 1975).

(Footnotes omitted.)

On November 24, 1976, the Commission announced new rules regulating commodity option transactions, under the authority of 7 U.S.C. § 6c(b). 17 C.F.R. § 32 (1977), 41 Fed.Reg. 51814. Lloyd Carr & Co. immediately and unsuccessfully challenged the regulations in *BACO v. Bagley, supra.* A more complete history of regulation under the Act can be found in *BACO,* 552 F.2d 485–488. 17 C.F.R. § 32.9 (1977) [7] is a "straightforward prohibition against fraud." 442 F.Supp. at 356. As noted in this court's opinion granting preliminary injunctive relief, "it [is] inherently fraudulent for an organization like Lloyd Carr to make bold predictions of astronomical returns on investment in a field as speculative and uncertain as commodity options." *Id.*

Numerous other actions, misrepresentations and omissions also violated Rule 32.9. Examples include misrepresentation of risks; misrepresentation of fees, commissions, other charges and break-even points; failure to disclose the impact of foreign currency fluctuations; misrepresentation of Lloyd Carr's registration status with the Commission; misrepresentation of the size and expertise of Lloyd Carr's research

staff; failure to promptly execute orders; and the sale of naked options.

17 C.F.R. § 32.5 (1977) requires that "prior to the entry into a commodity option transaction, each option customer or prospective option customer shall be furnished a summary disclosure statement by the person soliciting or accepting the order therefor." The Rule also sets out an extensive list of material facts which must be disclosed in the required statement.

Defendants have repeatedly violated Rule 32.5 by failing to provide a disclosure statement; by providing statements only *after* the transactions were entered into; and by providing statements which fell far short of the disclosure requirements of the Rule.

17 C.F.R. § 32.8(c) (1977) makes it unlawful for "[a]ny person, upon receipt of an order for a commodity option transaction, unreasonably to fail to secure prompt execution of such order." Defendants repeatedly violated this rule by unreasonably delaying execution of customer orders and in some instances failing altogether to execute the orders, in effect selling naked options.

RELIEF

The Commission first requests converting the preliminary injunction into a permanent injunction. 7 U.S.C. § 13a–1 provides that "[u]pon a proper showing, a permanent ... injunction ... shall be granted" against "any ... person [who] has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of [the Act] ... or any rule, regulation, or order thereunder ...."

█ The standard for granting injunctive relief, as fully detailed in the court's earlier opinion is "a showing that illegal

---

7. **§ 32.9 Fraud in connection with commodity option transactions.**

 It shall be unlawful for any person directly or indirectly—

 (a) To cheat or defraud or attempt to cheat or defraud any other person;

 (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;

 (c) To deceive or attempt to deceive any other person by any means whatsoever;

in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction.

activity has occurred and that there is a reasonable likelihood that the wrong will be repeated." 442 F.Supp. at 355. *See Commodity Futures Trading Commission v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.1979); *Commodity Futures Trading Commission v. British American Commodity Options Corp.,* 560 F.2d 135, 141 (2nd Cir.1977), *cert. denied,* 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d 1147 (1978); *Commodity Futures Trading Commission v. U.S. Metals Depository Co.,* 468 F.Supp. 1149, 1161–1162 (S.D.N.Y.1979).

> It has been recognized that past illegal conduct is probative in deciding whether a likelihood of future violations exists. Nonetheless, the totality of the circumstances must be considered to determine whether "there is a reasonable expectation that the defendants will thwart the policy of the [securities laws] by engaging in activities proscribed thereby." *Securities and Exchange Comm'n v. Texas Gulf Sulphur Co.,* 312 F.Supp. 77, 87 (S.D.N.Y. 1970).

442 F.Supp. at 355 (citations omitted). Earlier, in considering the need for a preliminary injunction in this case, the court had "no hesitation in stating that a preliminary injunction should be granted on the basis of 'the likelihood of future violations' standard." *Id.* at 356. This was before defendant Abrahams' previous record had been discovered. There can be no question now but what a permanent injunction should be issued.

The Commission also requests appointment of Walter McLaughlin, Sr. as a permanent Equity Receiver and an accounting. Mr. McLaughlin is presently serving in a similar capacity in the Massachusetts cases and his appointment here would not impose any additional burdens on him. And in essence, his accounting is nearing completion. Accordingly, the Commission's request is granted.

Finally, the Commission seeks disgorgement by all defendants, to the Receiver, of all benefits, "including, but not limited to, salaries, commissions and markups derived,

directly or indirectly, from the violative activities . . . ." Plaintiff Commission's Mem. in Support of Motion for Summary Judgment, p. 74. Disgorgement is an appropriate remedy under the Act. *Hunt, supra,* 591 F.2d at 1221–1223; *U.S. Metals Depository, supra,* 468 F.Supp. at 1163. Given the history of defendants' actions in this case, and the nature and extent of the fraudulent activities, disgorgement is proper, and plaintiffs' request for relief is granted.

MOTION FOR DEFAULT JUDGMENT

Plaintiff Commission has also filed a motion for default judgment against defendant Charles P. LeMieux, III. LeMieux was properly served and has not answered or otherwise appeared. Default was entered by the Clerk, on plaintiff's request, on March 2, 1983, pursuant to Fed.R.Civ.P. 55(a). The Commission now moves for default judgment pursuant to Rule 55(b)(2).

 On a motion for entry of default judgment pursuant to Rule 55(b)(2), allegations of fact in the complaint are taken as true unless they are contradictory on the face of the document. *Thomson v. Wooster,* 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885). Facts not established by the pleadings, or claims which are not well-pleaded, are not binding and cannot support a judgment. *Danning v. Lavine,* 572 F.2d 1386 (9th Cir.1978); *Nishimatsu Construction Co., Ltd. v. Houston National Bank,* 515 F.2d 1200 (5th Cir.1975). "[E]ven after default it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." 10 Wright & Miller, Federal Practice and Procedure: Civil, § 2688, pp. 447–448.

 The unchallenged facts alleged in the complaint are more extensive than those specifically found above in reference to the pending motion for summary judgment against the other named defendants. It is sufficient to note, however, that the facts alleged in the complaint are at a minimum, not materially different from those

stated in FINDINGS OF FACTS, *supra.* Those facts are sufficient to state a cause of action on each of the three counts in the complaint. *See* CONCLUSIONS OF LAW, *supra.* Accordingly, the Commission's motion for default judgment is granted as to liability.

 A default judgment on well-pleaded allegations establishes only defendant's liability; plaintiff must still establish the extent of damages. *Eisler v. Stritzler,* 535 F.2d 148 (1st Cir.1976); *Flaks v. Koegel,* 504 F.2d 702 (2d Cir.1974). The Commission seeks appointment of an Equity Receiver and an accounting to determine damages. Rule 55(b)(2) provides for a reference such as the Commission seeks here, to determine damages. The court deems this approach proper since LeMieux's liability cannot be computed on the record before the court. Therefore, the Commission's request is granted.

 In addition, the Commission seeks a permanent injunction against the type of activities alleged in the complaint. Permanent injunctive relief is most certainly appropriate in the present case as discussed in RELIEF, *supra.* Accordingly, a permanent injunction will issue against defendant LeMieux.

### ORDER GRANTING DEFAULT JUDGMENT, PERMANENT INJUNCTION AND DISGORGEMENT

Upon motion of the Plaintiff Commodity Futures Trading Commission for default judgment against the defendant Charles P. LeMieux, III, and upon this Court's finding that the defendant has failed to plead or otherwise defend in this action, and deeming it proper that judgment should be entered in favor of the Plaintiff, it is hereby

ORDERED, ADJUDGED AND DECREED that judgment by default be entered in this action in favor of the Plaintiff Commodity Futures Trading Commission against the defendant Charles P. LeMieux, III for the relief demanded in the Complaint of the Commission herein, as follows:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT the defendant Charles P. LeMieux, III, his agents, officers, servants, employees, successors, assigns, attorneys, and those persons in active concert or participation with him who receive actual notice of this order by personal service or otherwise, and each of them, singly or in concert, directly and indirectly, be and they hereby are forever restrained and enjoined from:

A. Directly or indirectly, in connection with any offer to enter into, any entering into or any conformation of the execution of transactions involving commodity options, by use of the mails or any means or instrumentalities of interstate commerce,

(1) cheating or defrauding or attempting to cheat or to defraud any other person;

(2) making or causing to be made to any other person any false report or statement or entering or causing to be entered for any person any false report; and

(3) deceiving or attempting to deceive any other person by any means whatsoever concerning, among other things:

(a) claims of expected returns and profits from commodity option transactions, or any other transactions within the coverage of the Act;

(b) claims of expected changes in the prices of commodity futures underlying commodity option transactions, or any other transactions within the coverage of the Act;

(c) claims of assured profits in commodity option transactions, or any other transactions within the coverage of the Act;

(d) representations as to or concealment of the costs of commodity option transactions, including the commissions, fees or markups charged for executing, carrying and liquidating such option transactions;

(e) claims regarding the knowledge, experience and expertise of any person respecting commodity option transactions or any other transactions within the coverage of the Act;

(f) representations regarding the ownership of commodity options purchased for customers, or the protections provided such customers by exchanges in London, England;

(g) claims regarding the research underlying Lloyd, Carr & Co.'s recommendations pertaining to the offer and sale of commodity options;

(h) concealment of the distinction between the strike price and break-even point for commodity options;

(i) claims regarding the risks of loss in commodity options transactions;

(j) representations as to the past experience of purchasers of commodity options from Lloyd, Carr & Co. including the profits earned by such purchasers;

(k) exhortations to prospective and actual customers to act in haste;

(l) concealment of the effects of foreign currency fluctuations on investments in London commodity options;

(m) representations as to Lloyd, Carr and Co.'s membership on or affiliation with London exchanges or member firms thereof which trade or clear commodity options.

(4) Prior to the entry into any commodity option transactions, failing to furnish option customers or prospective option customers with a summary disclosure statement as required by 17 C.F.R. § 32.5, or any amendments thereto;

(5) Prior to the entry into a commodity option transaction, to the extent the following amounts are known, failing to inform customers or prospective customers of the actual amount of the premium, markups on the premium, costs, fees and other charges comprising the purchase price, as well as the striking price and all costs to be incurred by the option customer if the commodity option is exercised.

(6) Accepting any money, securities or property (or extending credit in lieu thereof) from an option customer as payment of the purchase price in connection with commodity option transactions, while failing to furnish, not more than 24 hours after the execution of such commodity option transactions, by mail or other generally accepted means of communication, such option customer with a written confirmation statement containing at least the following information:

(a) The actual amount of the purchase price including a separate listing of the premium, markups on the premium, costs, fees, and other charges;

(b) The exercise date of the commodity option purchased; and

(c) The date the commodity option was executed.

(7) Unreasonably failing, upon receipt of orders for commodity option transactions, to secure prompt execution of such orders, and

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Defendant Charles P. LeMieux, III, disgorge to the Receiver Walter McLaughlin, Sr., Esq. all benefits including, but not limited to, salaries, commission and markups derived directly or indirectly, from the violative activities described herein, in an amount to be determined upon the filing of the Equity Receiver's Affidavit with this Court.

## ORDER GRANTING SUMMARY JUDGMENT, PERMANENT INJUNCTION AND OTHER RELIEF

Upon the motion of plaintiff Commodity Futures Trading Commission ("CFTC") for summary judgment and for permanent relief, having considered the pleadings filed in this cause, the motion and memorandum of points and authorities in support of plain-

tiff's motion, and all other papers filed herein, it appearing that the Court has jurisdiction over the parties and subject matter, and that defendants, unless restrained, will continue to violate the Commodity Exchange Act, as amended, 7 U.S.C. § 1, *et seq.,* and regulations promulgated thereunder, and the Court being otherwise fully advised in the premises:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the motion of the CFTC for summary judgment against defendants Lloyd, Carr & Co., Lloyd Carr Financial, and James A. Carr (a/k/a Alan H. Abrahams) is granted, and

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the defendants James A. Carr (a/k/a Alan H. Abrahams) and Charles P. LeMieux, III d/b/a Lloyd, Carr & Co., a partnership, and also doing business as Lloyd Carr Financial Co., and James A. Carr (a/k/a Alan H. Abrahams), their agents, officers, servants, employees, successors, assigns, directors, attorneys, subsidiaries, affiliates and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, and each of them, singly or in concert, directly and indirectly, be and they hereby are forever restrained and enjoined from:

A. Directly or indirectly, in connection with any offer to enter into, any entering into or any confirmation of the execution of transactions involving commodity options, by use of the mails or any means or instrumentalities of interstate commerce,

(1) cheating or defrauding or attempting to cheat or to defraud any other person;

(2) making or causing to be made to any other person any false report or statement or entering or causing to be entered for any person any false report; and

(3) deceiving or attempting to deceive any other person by any means whatsoever concerning, among other things:

(a) claims of expected returns and profits from commodity option transactions, or any other transactions within the coverage of the Act;

(b) claims of expected changes in the prices of commodity futures underlying commodity option transactions, or any other transactions within the coverage of the Act;

(c) claims of assured profits in commodity option transactions, or any other transactions within the coverage of the Act;

(d) representations as to or concealment of the costs of commodity option transactions, including the commissions, fees or markups charged for executing, carrying and liquidating such option transactions;

(e) claims regarding the knowledge, experience and expertise of any person respecting commodity option transactions or any other transactions within the coverage of the Act;

(f) representations regarding the ownership of commodity options purchased for customers, or the protections provided such customers by exchanges in London, England;

(g) claims regarding the research underlying Lloyd, Carr & Co.'s recommendations pertaining to the offer and sale of commodity options;

(h) concealment of the distinction between the strike price and break-even point for commodity options;

(i) claims regarding the risks of loss in commodity options transactions;

(j) representations as to the past experience of purchasers of commodity options from Lloyd, Carr & Co. including the profits earned by such purchasers;

(k) exhortations to prospective and actual customers to act in haste;

(*l*) concealment of the effects of foreign currency fluctuations on investments in London commodity options;

(m) representations as to Lloyd, Carr and Co.'s membership on or affiliation

with London exchanges or member firms thereof which trade or clear commodity options.

(4) Prior to the entry into any commodity option transactions, failing to furnish option customers or prospective option customers with a summary disclosure statement as required by 17 C.F.R. § 32.5, or any amendments thereto;

(5) Prior to the entry into a commodity option transaction, to the extent the following amounts are known, failing to inform customers or prospective customers of the actual amount of the premium, markups on the premium, costs, fees and other charges comprising the purchase price, as well as the striking price and all costs to be incurred by the option customer if the commodity option is exercised.

(6) Accepting any money, securities or property (or extending credit in lieu thereof) from an option customer as payment of the purchase price in connection with commodity option transactions, while failing to furnish, not more than 24 hours after the execution of such commodity option transactions, by mail or other generally accepted means of communication, such option customer with a written confirmation statement containing at least the following information:

(a) The actual amount of the purchase price including a separate listing of the premium, markups on the premium, costs, fees, and other charges;

(b) The exercise date of the commodity option purchased; and

(c) The date the commodity option was executed.

(7) Unreasonably failing, upon receipt of orders for commodity option transactions, to secure prompt execution of such orders, and

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Walter McLaughlin, Sr., Esq., currently serving as Trustee in Bankruptcy for Lloyd Carr & Co. and Alan Abrahams a/k/a James A. Carr, in Massachusetts [*In re Alan Abrahams and Lloyd Carr & Co.,* Nos. 78–204–Z, 78–208–Z, 78–209–Z (D.Mass.)] and as Equity Receiver for Lloyd Carr & Co. and Lloyd Carr Financial Co. in the injunctive action brought by the Commodity Futures Trading Commission [*CFTC v. Carr, et al.,* # CA 77–371Z (D.Mass., appointed Jan. 19, 1978)] is hereby appointed permanent equity Receiver in this case and that his duties be limited to those for which he is currently responsible in Massachusetts, and that he is not required to perform any additional duties in this case except as specified herein, and that he is not required to post bond for the performance of his duties; and

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that in accordance with his duties as Receiver and Trustee in the Massachusetts cases, the Receiver McLaughlin file with this court a duplicate copy of the Trustee's final report and accounting simultaneous with his filing same in the Massachusetts action(s), and that said final report and accounting should specify any amounts to be disgorged by defendants, and

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the defendants Carr and LeMieux, d/b/a Lloyd Carr and Co. and Lloyd Carr Financial, and James A. Carr (a/k/a Alan Abrahams) disgorge to the Receiver all benefits including, but not limited to, salaries, commission and markups derived, directly or indirectly, from the violative activities described herein, to the extent that this had not already been accomplished in the course of the Massachusetts litigation cited above, in an amount to be determined upon the filing of the Equity Receiver's final report and accounting.