**In re WILDLIFE CENTER, INC., Debtor.**

**WILDLIFE CENTER, INC., Plaintiff,**

v.

**FASIG TIPTON KENTUCKY, INC., Defendant.**

**WILDLIFE CENTER, INC., Plaintiff,**

v.

**SOUTHLAND FARM and/or Fernung Stallions, Defendant.**

**Bankruptcy No. 088–80985–21.**
**Adv. Nos. 089–0022–21, 089–023–21.**

United States Bankruptcy Court, E.D. New York.

June 22, 1989.

Michael E. Walter, Port Jefferson, N.Y., for debtor-plaintiff.

OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Before the Court are two adversary proceedings brought by Wildlife Center, Inc.

("Wildlife") which filed a voluntary petition under Chapter 12 of the Bankruptcy Code on October 20, 1988. Wildlife is now a debtor-in-possession with all the rights and powers of a trustee serving in a case under Chapter 11. 11 U.S.C. § 1203. Because the two adversary proceedings involve very similar facts, they are being dealt with in one opinion, although they remain in all respects separate proceedings.

The plaintiff, Wildlife, is one of several related entities, all of whom have filed under Chapter 12 as farmers. They are Robert and Cathleen Novak, who are husband and wife, and who are the sole owners of the other two entities, both corporations, one of which is known as Novak's Tropical Aviary ("NTA") and the other which is the debtor herein. NTA was organized in 1974 and Wildlife in 1986 to carry on a similar business. They claim to have operated essentially as one unit, commingling funds and sharing expenses. The first to file under Chapter 12 was NTA which filed on August 15, 1988, Wildlife filed on October 20, 1988, and Robert and Cathleen Novak on November, 17, 1988. All of them are engaged in the growing of grain, breeding of birds and the breeding and stabling of horses.

Wildlife's schedules listed assets in the amount of $32,660 and debts in the amount of $239,050 and said it had done business under the following names: "Wildlife Stable, Suffolk Stable, Nova Seed, Novak's Wildlife Center, Novak's Aviary, Nova Farm."

None of the debtors has confirmed a Chapter 12 plan. NTA's and Wildlife's plans were denied confirmation on February 21, 1989, Novaks on April 14, 1989. Wildlife has appealed. Under that plan nothing will be paid unsecured creditors; a second plan, in abeyance because of the appeal, will pay a nominal amount, $2,000 in all, to unsecured creditors.

The complaint against defendant Southland Farm and/or Fernung Stallions ("Southland"), seeks an order requiring the defendant to turn over to Wildlife a "Stallion Service Certificate."

In the other adversary proceeding Wildlife asks for an order requiring Fasig Tipton Kentucky, Inc. ("Fasig–Tipton"), the defendant, to turn over "[J]ockey Club Certificates for four thoroughbred horses and two Stallion Service Certificates."

Southland Farm is located in Ocala, Florida, Fasig–Tipton, in Lexington, Kentucky. Each complaint declares that the documents involved to be in the possession of the defendant as agent of the plaintiff. Both defendants were served by mail and both have defaulted. Neither has served an answer nor appeared.

Each complaint identifies the proceeding as a core proceeding under 28 U.S.C. § 157(b)(2)(F), (K). 28 U.S.C. § 157(b)(2) lists specific types of proceedings which are included in the term "core proceedings," that is proceedings which the bankruptcy judge may hear and determine. The reference to Section 157(b)(2)(F), which covers preferences, appears to be a typographical error, what is apparently intended is Section 157(b)(2)(E), which includes in core proceedings "orders to turn over property of the estate." Section 157(b)(2)(K) covers "determinations of validity, extent or priority of liens." However, nothing in the body of either complaint alleges the existence of any lien. Each complaint is captioned "Complaint for Turnover Order" and the relief requested is a turnover of the property described, not a declaration with respect to the validity of a lien.[1]

---

1. The complaints allege these actions to be core proceedings. However, the adjudication of a debtor's right to specific property held by a third person is generally not a core proceeding, but falls into the category of a non-core, related proceeding. "[a] turnover proceeding can only be considered a core proceeding under Section 542(b) when its purpose is the collection rather than the creation, recognition, or liquidation of a mature debt ..." *Acolyte Electric Corp. v. City of New York*, 69 B.R. 155, 172 (Bankr.E.D.N.Y. 1986), *aff'd* No. 86–0329 (JWB), 1987 WL 47763 (E.D.N.Y. March 27, 1987). In a non-core, related proceeding a bankruptcy judge may only submit proposed findings of fact and conclusions of law to the district court subject to *de novo* review absent consent by the parties to final determination by the bankruptcy court. 28 U.S.C. § 157(c); *In re Satelco, Inc.*, 58 B.R. 781, 785 (Bankr.N.D.Tex.1986).

Bankruptcy Rule 7055 makes FRCP. 55 applicable to adversary proceedings in the bankruptcy court. Rule 55 authorizes the Court to conduct a hearing, if needed to establish the truth of any averment, by evidence, in order to enable the court to enter judgment.

The failure to obey a properly issued turnover order constitutes of contempt of court and invites the sanctions with which contempt is punished. A turnover order is in the nature of a mandatory injunction. *In re Satelco, Inc.*, 58 B.R. 781, 786 (Bankr.N.D.Tex.1986). "It goes without saying that an injunction is an equitable remedy. It 'is not a remedy which issues as of course,' *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337–338, 53 S.Ct. 602, 603, 77 L.Ed. 1208 (1933) ...'' *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982).

Because of the drastic nature of the relief requested, the Court was unwilling to enter a judgment by default but insisted on an inquest. The Court deemed it necessary that the truth of the averments in the complaint be established by evidence because the relief requested went far beyond being a simple money judgment.

### Southland–Fernung Stallions

Robert Novak was the sole witness called by Wildlife in both proceedings. He testified that a mare, "Native Cheta" was the property of Wildlife, that it had been bred to a stallion, "Barrera" standing at Southland Farm, Ocala, Florida, (also known as Fernung Stallions, Inc., or Fernung), that a foal had been delivered, but that the defendant had refused to turn over to Wildlife the "Stallion Service Certificate" needed to have the foal receive recognition of its breeding and that without such recognition the value of the foal was substantially diminished from what it would otherwise be. He also testified that a foal is the property of the owner of the mare which bears it.

Wildlife produced and introduced into evidence (1) a photostatic copy of a Jockey Club Certificate of Registration which carried various endorsements showing that Native Cheta had been transferred to Wildlife on March 10, 1987 (Ex. 1); (2) a document entitled "Stallion Contract," dated April 17, 1987 addressed to "Bob Novak, d/b/a Nova Farms, P.O. Box 400, Calverton, New York, 11933" and signed by Brent Fernung as Farm Manager, and accepted "By: Nova Farms," followed by the signature of Bob Novak over the caption "Mare Owner" (Ex. 2); (3) an invoice dated August 31, 1988 from John Fernung, P.O. Box 2226, Ocala, Florida, to Bob Novak, Box 400, Calverton, New York, 11933, for a stud fee and service charge in the total amount of $3,710 (Ex. 3); a letter captioned "Re: Bob Novak," dated September 29, 1988, from Larry Collins, Esq., to Michael Walter, Esq., Wildlife's attorney (Ex. 4). The letter reads in part:

> My client, Fernung Stallions, Inc. has a contract for stallion services with a fellow named Bob Novak, who neglected to perform his side of the agreement, which involves paying money.
>
>     *     *     *     *     *     *
>
> Fernung Stallion, Inc. does not respond well to threats, particulary [sic] threats invoking the power of the federal government. Further, we are unimpressed with shabby tricks, especially inartful ones. It necessarily follows, then, that the attempt to extort a stallion service certificate is rejected. Mr. Novak will be presented with that certificate when he pays what's due.

(Wildlife Exhibit 4)

### Fasig–Tipton Kentucky

With respect to the claim against Fasig–Tipton, Mr. Novak testified that in January 1988 he purchased four horses at the Fasig–Tipton Kentucky Winter Mixed Sale; that in so doing he was acting for Wildlife; that his demands to Fasig–Tipton for the Jockey Club Certificates for Hip Numbers 109, 240, 539 and 574, and the Stallion Service Certificates for 109 and 240 relating to these horses have been rejected; that these documents belong to the owner of these horses; and that the value of the four horses is substantially diminished by

the lack of these documents because without them the horses cannot participate in race meetings.

Wildlife introduced a number of other documents into evidence: (1) a memorandum dated April 5, 1988 entitled "Acknowledgment of Purchase" recording the purchase at auction of the horse identified as Hip Number 109, for a purchase price of $800. The buyer is identified as "Bob Novak"; his business address is given as Box 400, Calverton, New York, 11937. The document reads in part:

> I, the undersigned, hereby purchase the above horse and acknowledge and affirm that:
>
>   *    *    *    *    *    *
>
> (2) pursuant to condition Sixth of the Conditions of Sale, a Security Interest is granted to Auctioneer in this horse, in its Jockey Club Certificate of Registration and in any proceeds if credit is extended in connection with purchase of this horse and the total amount owing to Auctioneer per invoices is not paid, and I authorize the filing as a Financing Statement of this document and a copy of the catalogue page describing this horse for the purposes of identification, and agree that the Auctioneer shall have all the remedies of a Secured Party pursuant to the Conditions of Sale and the Uniform Commercial Code or other applicable law.

Wildlife also put into evidence: (1) check drawn on the account of Wildlife Center, Inc., in the amount of $864, dated April 5, 1988, and payable to Fasig–Tipton. Wildlife's address is shown on the check as Post Office Box 1002, Riverhead, New York, 11901 (Ex. C); (2) a letter dated February 13, 1989 from the Bank of New York, Ronkonkoma, New York, to Robert Novak, President of Wildlife, stating that telephone inquiries regarding his credit in 1987 "were only answered based on our relationship with your Business Account" NTA and Wildlife (Ex. B); and (3) a letter from Ogdon, Stargill & Welch to Wildlife's attorney, Michael Walter, Esq., dated February 28, 1989, which reads in part:

> Consistent with the objection of Fasig–Tipton Kentucky, Inc to the above-referenced Chapter 12 Plan, this is to advise that the subject horses which were purchased from Fasig–Tipton were purchased by Robert Novack [sic] individually and the obligation resulting therefrom, is an obligation of Mr. Novack and not of the above-referenced Debtor. In the event that Mr. Novack transferred the subject horses to the Debtor–Corporation, this obviously does not alter Mr. Novack's obligation to Fasig–Tipton. As set forth in the objection previously filed, Fasig objects to being included in the Chapter 12 proceeding and any suggestion that their rights against Mr. Novack have been altered or that the subject horses constitute property of the bankruptcy estate pursuant to 11 U.S.C. Section 541.
>
> Concerning your demand that certain Jockey Club Certificates and a Stallion Service Certificate be turned over to the Debtor, Fasig–Tipton respectfully declines to turn same over to the Debtor absent full payment of its debt by Mr. Novack.

(Wildlife Exhibit A)[2]

## DISCUSSION

The two complaints are predicated on Section 542(a) of the Bankruptcy Code which provides:

> "... an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title ... shall deliver to the trustee, and account for, such property or the value of such property ..."

To fall under Code Section 542(a) the property must be property of the estate. Prop-

---

**2.** The objection to which reference is made in the letter is Fasig–Tipton's objection to Wildlife's plan of reorganization refused confirmation for other reasons. The objection makes two points. First, that Fasig–Tipton is not a creditor of Wildlife and has never transacted business with Wildlife; second, that it is a secured creditor of Novak, following his purchase of four thoroughbred horses at the Fasig–Tipton Kentucky Winter Mixed Sale, January 6 to 8, 1988.

erty of the estate includes all legal or equitable interests of the debtor in property as of the commencement of the case. § 541(a)(1). In addition, for a trustee, or debtor-in-possession, to be entitled to the turnover of property he must have the right to use, sell or lease the property under § 363. But, a trustee or debtor-in-possession may use, sell or lease property (other than cash collateral) in which another entity has an interest only if he secures the consent of the other entity or provides adequate protection for such security interest. Section 363(e).

Except for the cryptic reference in the complaints to this Court's jurisdiction as being due to the fact that this is a proceeding to determine the validity, extent or priority of liens, the complaint nowhere acknowledges that the documents which are to be turned over represent, or are the product of, a security interest. To the contrary, the complaints assert an unqualified right to possession in the debtor Wildlife. Thus, the complaint against Southland flatly asserts "... at the time of their [sic] bankruptcy, the debtor was possessed of certain goods to wit, one Stallion Service Certificate. At said date, that property was in the possession of the defendant who held it as agent for the debtor." Identical assertions appear in the complaint against Fasig–Tipton.

■ On a motion for entry of a default judgment allegations of fact in a complaint are not to be taken as true if they are contradicted by other allegations. *Thomson v. Wooster*, 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885). Similarly, they must lose their conclusive effect if demonstrated to be false by the proof offered by the plaintiff. "Facts not established by the pleadings, or claims which are not well pleaded, are not binding and cannot support a judgment." *Kelley v. Carr*, 567 F.Supp. 831, 840 (W.D.Mich.1983). "Even after default it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." 10 Wright &

Miller, Federal Practice and Procedure, Civil, § 2688, pp. 447–448.

The evidence introduced by Wildlife at the inquest establishes that the documents which Wildlife wishes to have turned over to it were never in its possession and that those currently holding these documents are not acting as agents of Wildlife, but in opposition to it. What Wildlife is claiming as a right to possession based on its alleged ownership of the horses to which the documents pertain.

The documents in question are peculiar to horses and horse racing. Although the Jockey Club is a private organization, under local law no horse may start in any race unless duly registered and named in the registry office of the Jockey Club. *See generally, Morgan v. New York Racing Association*, 72 A.D.2d 740, 421 N.Y.S.2d 249 (2d Dep't.1979).

What then is the nature of the document which Wildlife seeks to have turned over to it? Are they property or are they a form of security interest? The complaints assume that they fall into the former category, but whatever the correct answer, Wildlife's complaints and proof fall short of entitling it to the only relief it seeks, a turnover order.

In *Lee v. Cox*, 18 U.C.C. 807 (D.C.M.D. Tenn.1976), the District Court held, reversing the Bankruptcy Court there involved, that despite the importance of the Jockey Club Certificates to a horse, it and the horse are not the same property. Possession of one does not mean possession of the other. In that case the bankruptcy judge, on facts similar to those present here, issued an order requiring the turnover to a Chapter 11 debtor of the registration certificates for eight Arabian horses sold to the debtor at public auction. The District Court reversed holding the certificates to be property separate from the horse in which certificates security interest was perfected by possession. The Court said:

> Although the registration papers could not give appellant a right to the horses, the question remains as to whether their possession gave the appellants *a security interest in the papers themselves.*

This proposition is a novel one and one that has yet to be addressed by any court. It is quite normal to assume, as apparently the Bankruptcy Judge did, that these papers have no value without the horses. It is, however, indisputable that the horses will sell at a much higher price with the certificates than without; therefore, an industrious holder could presumably seek to arrange their sale. Thus, at least under pre-[UCC] Code law, possession of the papers might have been enough to perfect a security interest in the papers themselves as a kind of personal property, much as a pawnbroker might perfect an interest in a valuable piece of jewelry by taking it into his possession as security for an outstanding debt. See: American Law Institute, Restatement of Security, § 2, Comment (b), Illustration 5 at 15 (1941). Although this sort of arrangement does not fit squarely within any of the categories of § 9–305, it is consistent with a concern expressed in the [UCC] Code as discussed above; it alerts the parties to the ongoing security transaction. Given the conclusion that *appellant successfully perfected a security interest* in the papers themselves, and the fact that the debt was not paid in full as the contract required, the Bankruptcy Judge had no authority to require that the papers be turned over to the debtor's estate. As stated in Collier on Bankruptcy, 4A § 70.21 at 266 (1975): "Where there is a valid pledge, the pledgor's trustee .succeeds to his power of redemption and is entitled to restoration of the pledged property or its proceeds only upon payment of the debt or performance of the engagement." So that Lee had only an equitable interest in the papers which was extinguished when the debt went unpaid.

*Lee v. Cox*, 18 UCC 807, 810.[3] (emphasis added)

Consistent with *Lee v. Cox*, the auction ticket signed by Novak, acting, he says, on behalf of Wildlife, treats the horse and the Jockey Club Certificates as separate and distinct property, claiming a security inter-

est *"in* this horse, *in* its Jockey Club Certificate of registration, and *in* any proceeds." The repetition of the word "in" is the grammarian's way of indicating that the horse and security interest are separate kinds of property in each of which the auctioneer, now the defendant, has a security interest. This is the contract which Novak signed as agent for Wildlife and to which Wildlife is now bound. By retaining possession of the documents which are the subject of the complaints, Southland and Fasig-Tipton successfully perfected a security interest in them which neither the complaints nor the proof provide grounds for invalidating. Thus, under any view of the facts as admitted by the default and introduced at the inquest, Wildlife is not entitled to a turnover order.

Finally, there are considerations peculiar to this case which would make it inappropriate to require either Southland or Fasig–Tipton to turn over the breeding certificates and the Jockey Club Certificates to Wildlife. According to the documents put in evidence by Wildlife, neither Southland nor Fasig–Tipton ever had any dealings with Wildlife. Both contracted exclusively with Mr. Novak. He represented himself to Southland as the owner of the mare he asked Southland to service and to Fasig–Tipton as the buyer of the four horses at the auction sale. In applying the law, the bankruptcy court is under an obligation to consider the equities of the situation in order to avoid an inequitable result. *Bank of Marin v. England*, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966).

Just recently the Court of Appeals for the Second Circuit has held that property in the possession of a debtor never became part of the debtor's estate because it was the subject of a constructive trust due to the debtor's misconduct. *Sanyo Electric, Inc. v. Howard's Appliance Corp.*, 874 F.2d 88 (2d Cir.1989). In that case the creditor was misled as to the ultimate destination of the goods it sold, leading to a failure to perfect its security interest. In

**3.** An alternative ground relied on by the District Court was that the contract between the parties authorized the auctioneer to retain the papers until he was paid in full.

this case, the creditors were misled as to the entity with which they were dealing. However, because for other reasons Wildlife has failed, despite the default of the defendants, to establish its right to the turnover order it requests, it is unnecessary for this Court to determine the effect on the respective rights of the parties of Novak's failure to disclose Wildlife's interest.

To sum up, at the time Wildlife filed it did not have possession of the Stallion Service Certificate for the mare serviced by Southland and it did not have possession of the Jockey Club Certificates or the Stallion Service Certificate for the four horses bought from Fasig–Tipton at the auction sale. Since these documents were not part of Wildlife's property under 11 U.S.C. § 541 the persons holding this property cannot be compelled to turn them over pursuant to 11 U.S.C. § 542. If they are a form of lien, the complaints allege no reason for avoiding such lien.

For the foregoing reasons the plaintiff is not entitled to a turnover order and its complaints are dismissed.

Judgments are being entered consistent with this Opinion.